Freeman, J.,
delivered the following dissenting opinion:
I dissent from the views of a majority of the court in this case, and on the general question, and deem it a proper occasion to give some of the reasons for such dissent.
*277 I hold that the provision, of the declaration of rights has been misconstrued, and, as I think, misunderstood, in the various decisions holding that juries are the judges both of the law and fact in criminal cases. The clause is found in Art. I., sec. 19th of the declaration of rights, and is as follows: After reciting that free communications of thought and opinons is one of the invaluable rights of men, etc., it adds, “but in prosecutions for the publication of papers investigating the official conduct of officers or men in public capacilv. <l-c Pulh thereof may be given in evidence, and in all indictments for libel, the jury shall have a right to determine the law and the facts, under the direction of the court, as in other criminal cases.” We have but to refer to the history of the great struggle in England on the right of a jury to return a general verdict, that is, of guilty or not guilty, in prosecution for libels reflecting on the government or its officers, to have the key to this provision, and see at once its meaning. It is evident, however, from the very terms of the provision, that it had reference to this question, and? this alone. Its language clearly excludes the idea that it was intended to make any change in the long settled rules of the common law as to the respective duties and spheres of action of a court and jury in criminal cases generally. It is not that juries are judges of the law and facts in all criminal cases, but that in “all indictments for libel, the jury shall have the right to determine the law and the facts, under the direction of the court; not to disregard them as in other criminal cases.- In other words, indictments for libels should stand on this question precisely as other’ criminal cases stood, and the rights of the jury should be the same in these cases as in other criminal cases, no more, no less. But the right of juries in other criminal cases is not in the- least altered, enlarged, modified or changed by this provision from what they were when the constitution was adopted. In fact, the provision may be held to fix the rights of juries as they *278 were at common law, by fair implication and recognition as to all criminal cases, and only intending, and by its terms doing so, to place cases of libel on the same footing, thus freeing it from the various decisions in England, that had made it an exception. This is made clear by the language that, “they shall judge of the law and the facts, under direction of the coui*t, as in other criminal cases,” not independent of that direction, but subordinate to it, being directed by it. To what extent shall this be? The answer is, as in other criminal cases, that is, the jury shall have the same rights in deciding on a question of libel that they then had in other criminal cases at that time, by the general, common law of the land. How this provision, seemingly so plain and unambiguous, could ever have been tortured into the idea that a judge was only a witness to the jury in criminal cases as to the law, whose testimony might be disregarded at will, if the jury so' choose, as stated in some of our cases, is one of strange anomalies in judicial opinion scarcely to be accounted for on any well-defined principle of reasoning or sound philosophy. But when we turn to the history of the subject intended to be regulated by this clause, the weather is made too clear for doubt — it is a demonstration. It is one of the most interesting legal struggles in the history of English jurisprudence, the contest between the judges appointed by the crown, in their efforts to put down freedom of speech, and a free and manly criticsm of the acts of government, with its officials, by claiming the right to decide, on the part of the court, on the question of guilt or innocence of the party indicted for libel. This contest, which had long been waged between the bar and the courts, and in the publication of the pamphleteers of that period, the newspaper not having then attained its present prominence, culminated into its fullest malignity in the great trial of “The King v. Woodfall, for publishing the celebrated, letter of Junius to the King,” decided about 1769 or 1770, we believe. Lord *279 Mansfield, as lie did in numerous other cases, laid down the law to be that, the jury could only find the fact of publication, that is, return a verdict on the question whether the defendant was guilty of publishing the paper for which he stood indicted, and then it was for the court to decide whether it was libelous or not, and whether he was guilty of the offense of which he stood charged, that is, of libel, and affix the punishment.' This became the settled law of England, we believe, finally settled by Lord Mansfield, in the great case of the Dean of Asaph, in which Erskine delivered, perhaps, the most perfect piece of forensic eloquence in the English language, vindicating, with wonderful power, the right of a jury to find a verdict of guilty or not guilty, thus passing on the guilt or innocence of the party, and not on the question alone of the fact of his having published a paper which was claimed to be a libel. Lord Camden, one of the greatest champions of English liberty to be found in her annals, took up the question’ in Parliament, and there defied Mansfield to make good his judicial decisions in open debate, as well founded in the common law of England, from which contest the great English judge ignobly shrank. In 1791, Mr. Fox introduced into Parliament a bill declaring the law to be as Camden had maintained, which was ultimately passed, and embodied simply, in substance, the provision of our constitution. No doubt the clause of the declaration of rights •is taken iri substance from that bill. In the debate on this bill, the question at issue is shown unmistakably. The judges of England had said the question of “libel or no libel,” was. a question of law, for the court, and not of fact, for the jury.
Lord Camden maintained the contrary. He said, by way of illustrating his view, “A man may kill another in his own defense, or under various circumstances, which render the killing no murder. How are these things to be explained? By the circumstances of the case. What is the *280 ruling principle? The intention of the party. Who decides on the intention of the party, the judge? No; the jury. So' the jury are allowed tu judge of the intention upon an indictment for libel. The jury might as well be deprived of the power of judging of the fact of publication, for that likewise depends upon the intention. What is the oath of the jury? Well and truly to try the issue joined, which is the plea of 'not guilty to the whole charge.’ ” See Campbell’s lives of Lord Chancellors, vol. 5th, 280, et seq., for the history of this question. We have cited this extract, and hastily glanced at the history of the question, that we might see what was intended to be effected by the clause in our bill of rights, and what is the real meaning of the language used. It demonstrates that all that was proposed was to declare what the law should be in Tennessee on this great question in English jurisprudence, and settle it beyond all dispute, that juries should have the right to pass on the guilt or innocence of the defendant of the offense charged, as in other criminal cases, under the direction of the court, and not simply to find the fact of publication, and refer the question of guilt or innocence, libel or no libel, to the court. It would have astonished Lords Camden and Erskine, men educated in the common law of England, to have been told that a judge was but a witness to the jury of what the law was in a criminal case, or what were the elements of the crime against the law with which a defendant stood charged. Such an absurdity never entered their minds, nor did the framers of our constitution ever dream of the interpretation that has been put on this clause by loose dicta in our courts. They only intended to provide that the guilt or innocence of a defendant in libel cases should be passed on by the jury, as in other criminal cases — that is, guided by the rules of law, stable statute, fixed and well defined, not in accordance with the whims, caprice or prejudice of a jury, knowing nothing of law, perhaps, except what they might be able to gather from the *281 argument of counsel on the trial. The theory I am combat-ting is une that antagonizes itself to the whole theory of our law, as well as the organization of the departments of government. A fundamental idea in the common law was and is, that the court responds to questions of law, the jury to questions of fact. Carrying out and embodying this idea, judges are chosen from the legal profession as men amply learned in the great principles of our laws, competent to instruct and guide juries, by laying down the rules of law applicable to the case in hand, thus giving the principles of law, on which the rights of parties are to be determined by juries.
In our government, this idea is kept up by requiring our judges to be lawyers, and requiring them not to charge juries with respect to matters of fact, but allowing them to state the testimony and declare the law. In a word, the whole theory of our law and constitution on this question goes on the idea that the courts and judges are the repository of the law, and shall declare what it is, while juries are to decide upon and settle disputed questions of fact, and neither shall invade the province of the other.
This case well serves to show the contradictions to the general theory of our jurisprudence involved in the view we are combatting. No error of law is shown or given by the court. We must assume that the law was .correctly charged.
We are to reverse the case now, because the court did not tell the jury, in effect, as we construe it, that they might disregard the law as given, and decide the law for themselves — that is, administer their crude views as the law, rather 'than the law of the land as settled by the legislature and judicial decision. To this I cannot assent.
We might point out other incongruities and contradictions growing out of the opposite theory, but we have extended these hasty views already to' a greater length than was intended.
*282 My conclusion is, that juries are but judges of fact and the law in cases of libels, as in other criminal cases, under the direction of the court, and that in both cases they have only the right to find a general verdict of guilty or not guilty, under the direction of the court, as to the law governing the case, and that in no case are they judges of the law in the sense of having the right arbitrarily to say what that law is, or have the right to disregard the law as given them by the court, and set up for their guidance their own crude notions of what is the law of the land. We may add, that we continually recognize this rule by implication, by granting new trials in cases of conviction, where the jury has disregarded the charge of the court, as given to them, thus implying that they are hound by the law as given them by the judge, yet we are required to hold in the next breath, that he was bound to have told them that this was their right, and it be error in him if he failed so to do.
Believing as I do that the doctrine has already been carried too far, has been carried to the extent even of subverting a plain prolusion of the constitution in its intent and purpose, I am unwilling to extend it any further, by making it apply to cases of misdemeanors. In a word, believing the whole doctrine as generally given in charge by judges to be a wrong, and unsupported by the constitution, or sound principles of law and policy, I enter my dissent to it in toto whether, as applied felonies or misdemeanors, not believing in the idea that it is a function of law to furnish any facilities whatever for the escape of criminals from punishment, the one I think that correctly underlies in the mind of the advocate all appeals to the wisdom of juries and their fitness for the decision of questions of law in such cases, the real thought being that the skillful advocate may the more readily deceive and mislead them [than the] stern judges trained in the severe logic of our noble science.
I concur in this conclusion. McFarland.
*283 The application to leave the question decided in this case open for rehearing at the next term, is disallowed. The question can as well be reargued in some other case, and until then we see no sufficient reason for treating it as an unsettled question. Nicholson.